Phillip G. ORTWEIN and the Florida
Education Association, Inc.,
Plaintiffs,

v.

Cecil MACKEY, Individually, and as President of the University of South
Florida, et al., Defendants.

No. 71–523 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

April 6, 1973.

Richard Harlan Frank, Tampa, Fla., for plaintiffs.

Lawrence J. Robinson, General Counsel, University of South Florida, Tampa, Fla., Charles E. Miner, Jr., State Board of Education, Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER

KRENTZMAN, District Judge.

This Civil Rights case arises out of the intramural confines of an academic-administrative world. Plaintiff Ortwein, a nontenured faculty member at the University of South Florida, a state university, brought this action against the defendant President of the University, seeking injunctive relief relative to a pending termination of his employment, allegedly without due process of law. The outer contours of the due process rights of terminated nontenured faculty members have been delineated by two recent Supreme Court cases. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), (hereinafter Sindermann); Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (hereinaf-

ter Roth). Facts are capable of infinite permutation, however, and the instant case presents its own problems unresolved by prior cases.

At the outset, it should be noted that the Court is not suited for the role of campus administrator. Universities and Boards of Regents create and regulate procedures for the peculiarly sensitive task of determining the rights of faculty members to continued employment. This Court does not sit as a neutral arbiter over the wisdom of such procedures. In the instant case, however, plaintiff has brought a justiciable action within the jurisdiction of this Court concerning an alleged deprivation of due process rights by the University of South Florida, a public university.

The matter having come on before the Court upon a nonjury trial on November 27, 1972, the following memorandum opinion shall constitute its findings of fact and conclusions of law, pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. FACTS

During the later part of 1966, plaintiff sought employment at the University of South Florida as a physical education professor and tennis instructor. At the time, plaintiff was a tenured teacher in the Hillsborough County School System, serving as a principal at Thomas Junior High School. Plaintiff accepted a position at the University in November, 1966, after numerous discussions with Dr. Bowers, Director of the Physical Education Division. Pursuant to these discussions, plaintiff was hired as an assistant professor at the University commencing on December 1, 1966. Plaintiff's teaching activities consisted of both classroom work and physical training.

In accepting this position, plaintiff took a one year's leave of absence from the Hillsborough County School System. After one year of employment at the University, plaintiff was hired for an additional year. By staying at the Uni-

versity for this additional year, plaintiff lost his tenured status in the school system. Plaintiff testified that he allowed his tenured status in the school system to lapse because he fully expected to achieve tenure at the University. Dr. Bowers testified that he knew of the loss of plaintiff's school tenure, but that he also knew that plaintiff was "anxious" to work at the University.

Plaintiff's employment at the University continued on a year to year basis. In the fall of 1968, plaintiff was informally reviewed for possible tenure. After a close, but unfavorable, tenure committee review, plaintiff received a letter from Dr. Bowers on March 3, 1969, stating that he was not being considered for a permanent position at the University. Plaintiff immediately conferred with Dr. Bowers as to what, if anything, he could do to alter the situation. Plaintiff testified that Dr. Bowers suggested an upgrading effort in certain areas of his academic training.

In December of 1969, Dr. Bowers and others met with plaintiff to explain their positions regarding plaintiff's "lack of performance" in the functional areas of his teaching responsibilities. Plaintiff's expected termination date was extended, however, until December, 1970.

In the fall of 1970, plaintiff was mistakenly proffered a contract of employment extending until December 16, 1971. Plaintiff signed the contract. Thus, after almost two years of uncertainty, plaintiff's termination date was set at December 16, 1971.

On December 10, 1970, Dr. Bowers submitted a memorandum to Dr. Harris Dean, then Acting President of the University,[1] via Deans Martin, Wunderlich and Lawton, specifying the reasons for the decision to terminate plaintiff. The reasons listed were: 1) lack of performance in the functional program; 2) contribution to the Division confined to the limited area of tennis instruction;

3) lack of contribution to the profession outside the realm of his tennis classes; and 4) an unfavorable vote by the faculty in the Division. Thereafter, plaintiff received a letter from Dr. Dean confirming that his employment would be terminated after Quarter I, 1971 (December 16, 1971).

Plaintiff then turned to the Academic Relations Committee, a faculty committee created under the auspices of the University Senate. The Committee's function was to concern itself with inter-faculty relationships, and with the relationships between the academic staff and the administration. A panel of faculty members was brought together to hear plaintiff's complaints. As this was the third such panel created to hear a faculty complaint, it was termed "Panel III." Panel III, composed of seven faculty members with Dr. Reilly as chairman, convened a hearing on November 17, 1971, to allow plaintiff to state his case for non-termination.

On the date of the hearing, plaintiff appeared with his counsel. The "Interim Policy for Academic Relations Committee," part C, stated:

"The parties involved . . . will have the right to legal counsel in an advisory capacity. Such counsel will not have the right to make statements concerning his client nor to examine or cross-examine witnesses."

At the hearing, the members of Panel III did not allow plaintiff's attorney to actively participate in the proceedings. The hearing was aborted and this suit was filed on the following day, requesting injunctive relief. Plaintiff filed a motion for a preliminary injunction, and the Court entered a rule to show cause directing the parties to appear at a hearing on December 1, 1971. On December 2, 1971, the Court granted a preliminary injunction, which enjoined the defendant during the pendency of the action from terminating the employment of plaintiff without first according him

1. Subsequently Dr. Mackey, defendant herein, assumed responsibilities as President of the University of South Florida.

a hearing comporting with the standards of due process, specifically, allowing the active participation of plaintiff's counsel.[2]

Defendant appealed the granting of the preliminary injunction, but the appeal was dismissed for want of prosecution on March 7, 1972. After further proceedings in this Court, the case was tried before the Court on November 27, 1972.

On May 31, 1972, plaintiff received a letter from Cecil Riggs, Vice President of Academic Affairs, stating that he was to be terminated on November 30, 1972, because he would not have been granted tenure by the close of his sixth year of employment. The University has a six year "up or out" rule, whereby a faculty member shall be terminated if after the close of his sixth year of continuous employment, he has not been granted tenure. On November 30, 1972, this termination date was extended until June 14, 1973.

Defendant contends that this "up or out" termination is independent of the termination problems before this Court, and would thus not violate the preliminary injunction. Plaintiff contends that the University should not even be allowed to terminate him under the "up or out" rule without first according him a procedurally sound hearing pursuant to the issues before the Court.

## II. RIGHT TO A HEARING

The regulation under which plaintiff was to be terminated states:

"A. Termination of Nontenured Faculty Appointments—1. The President may, at his discretion, terminate the employment of a nontenured faculty member. Notice of non-reappointment, or of intention not to reappoint, shall be given in writing in accordance with the following standards: . . . at least twelve months before the expiration of an appointment after two or more years in the institution." Staff Handbook—University of South Florida, 1970–71, p. 27

Defendant has strenuously argued throughout this action that plaintiff was not entitled to a hearing relating to his termination, as he was a nontenured faculty member. Defendant contends that any hearing given plaintiff was a gratuity and for the sole purpose of providing an input of advisory data to the President for his ultimate consideration. Plaintiff asserts that he was entitled to a hearing, and alternatively, that even if he was not so entitled, any hearing given him had to comply with due process.

A. *Vitarelli*—"He that takes the procedural sword shall perish with that sword."

Whether or not plaintiff was entitled to a hearing regarding the allegedly false reasons for his termination, he contends that any hearing given as a gratuity by the University or by the University Senate must comport with due process. Having been granted the opportunity to contest the reasons for his termination, plaintiff argues that he could not be denied the right to have active counsel. Otherwise, any such hearing would be meaningless, and constitutionally unsound.

In support of this contention, plaintiff cites Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). In that case, a non-Civil Servant employee of the government was summarily terminated "in the interests of national security." The government had the right to summarily terminate the employee without giving any reasons. Having given a reason for the termination, however, the Supreme Court held that the government must abide by the procedural safeguards contained in governmental regulations for national security terminations. The Court did not hold that full due process

---

2. This decision was based upon the then existing law as stated in the Fifth Circuit by Sindermann v. Perry, 430 F.2d 939 (5 Cir. 1970). The law expressed in that case was, however, modified to some extent on appeal by the Supreme Court opinion in Sindermann.

rights must be accorded at such a hearing on an administrative matter. On the contrary, the case specifically held that an administrative agency must follow its own rules of procedure in those circumstances.

In the instant case, defendant followed the policy guidelines set forth by the Academic Relations Committee. The guidelines specifically provided that counsel could only take a passive role. Thus, defendant did follow its own rules of procedure.

Defendant points out that the Panel III hearing served an advisory function. According to Dr. Mackey, President of the University, the function and authority of Panel III was "to gather information relevant to the faculty member's concern, and pass on comments and recommendations as a result of review of that information to the President for the President's consideration." The President would have been in no way limited by the advice of Panel III. Dr. Mackey testified that an informal setting for the hearing was important to its advisory function, and that the active participation of counsel would unnecessarily formalize this setting.

█ It is not the function of this Court to pass upon the wisdom or propriety of such advisory hearings. The University Senate in its discretion set up a committee of faculty members devoted to faculty-staff relationships and to create a hearing procedure relative thereto. This Court does not hold that all such hearings must accord due process.

B. *Sindermann*—"The ancient institution of property."

Plaintiff asserts, however, that he was entitled to a due process hearing before he could be terminated. The due process rights of a terminated nontenured faculty member were constitutionally an-

alyzed in *Sindermann* and *Roth*. In those cases, and in the instant action, the boundaries of these due process rights are not contingent upon the "right-privilege" dichotomy so important in prior cases.[3] *E. g.*, United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950). The *Roth* and *Sindermann* cases turn, rather, on an analysis of "liberty" and "property" within a due process context:

> "The requirements of procedural due process apply only to the deprivation of interests encompassed within the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite." *Roth*, 92 S.Ct. at 2705.

In the *Sindermann* case, the Supreme Court held, *inter alia*,[4] that a faculty member might be able to show a property interest in his continued employment without the necessity of showing a tenured status at the university. The Court reasoned that there may be "an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure." Sindermann 92 S.Ct. at 2700. Where, for example, a university, such as Odessa College in the *Sindermann* case, has created a quasi-tenure policy in practice, plaintiff might show a property interest in continued employment despite lack of tenure.

In so holding, however, the Supreme Court abandoned the Fifth Circuit's terminology of "expectancy of reemployment." 430 F.2d 939 (1970). The Court held that a mere subjective expectancy of reemployment is not sufficient to create a property interest. More than a "unilateral expectation" is required. *Roth* 92 S.Ct. at 2709. The Court used the terminology of "implied

3. "[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural

due process rights." *Roth*, 92 S.Ct. at 2706.

4. In the instant case, there is no allegation of any First Amendment violation.

contracts" in attempting to define the type of property interest entitled to due process protection. The Court stated:

> " '[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' . . . A person's interest in a benefit is 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Sindermann*, 92 S.Ct. at 2699.

The instant case presents a somewhat less palpable claim to a property interest in continued employment. Plaintiff testified that he did fully expect to be granted tenure. He stated that he never would have allowed his tenured status in the school system to lapse if he had known he would not eventually be given tenure at the University:

> "My expectancy of employment was indicated by Dr. Bowers because he was aware that I had a one year leave of absence and by permitting that to expire without any indication that I was not acceptable would indicate to me that he was giving me an expectancy of employment." Deposition of plaintiff, p. 125.

Plaintiff also testified that his evaluation for tenure after two years at the University led him to expect continued employment. Dr. Bowers testified that he knew plaintiff was losing his tenured status in the school system, but that he also knew that plaintiff was "anxious" to work at the University.

■ Under the approach to "property" as charged by the Supreme Court in *Sindermann* and *Roth*, the Court finds that plaintiff did not have a property interest in continued employment at the University. Any "expectancy" he had was unilateral in nature. There was no express or implied agreement between plaintiff and Dr. Bowers, or any other

university official, that plaintiff could expect to be continually re-hired and eventually granted tenure. The Court does not doubt that plaintiff fully expected this to occur, but there was no reciprocal confirmation by the University of this belief that would create a bilateral agreement. "Property interests, of course, are not created by the Constitution." *Roth* 92 S.Ct. at 2709. Before the termination efforts of the University commenced with the letter from Dr. Bowers dated March 3, 1969, no promises, implied or express, were made to plaintiff concerning tenure.

■ It therefore follows that as to the property question, plaintiff was not deprived of his property without due process of law. The "taking" of his unilateral expectancy of reemployment did not rise to the stature of a constitutionally protected property interest. To equate this interest with a property interest is to stretch that term beyond the specific standards set forth by *Roth* and *Sindermann*.

> "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Roth* 92 S. Ct. at 2709.

Property in a Fourteenth Amendment context is a necessarily broad concept which should take within its province contemporary knowledge and understanding of circumstances and indicia worthy of constitutional protection. *See* Reich, The New Property, 73 Yale L.J. 733 (1964). The circumstances surrounding plaintiff's employment at the University, however, do not constitute such a property interest.

C. *Roth*—Liberty: "Essential to the orderly pursuit of happiness by free men."

The Fourteenth Amendment protects not only property, but also liberty. "Liberty" is, of course, a word fraught with much jurisprudential content. As a constitutional concept, "liberty" is a word imbedded in the very marrow of

this nation's legal structure. Indeed, Jefferson saw liberty as an "inalienable right" of all men. The Supreme Court has stated:

"While this court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration, and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska, 262 U. S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

The *Roth* Court stated: "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Roth* 92 S.Ct. at 2707.

Although the Court in *Roth* did not find a deprivation of liberty in the facts contained therein, the Court did outline two general areas within which a deprivation of liberty might be found where a governmental employee is not re-hired. As one example, the Court noted that, where the government, in declining to re-hire the individual, makes charges against him that might seriously damage his standing and associations in the community, that individual is entitled to notice and an opportunity to be heard. *Roth* at 2707. *See* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

There is no evidence in the instant case that plaintiff's failure to be re-hired placed his good name and honor at stake. The University, for example, made no charges of immorality, disloyalty, or dishonesty. *Cf.* Cafeteria & Res-

taurant Workers v. McElroy, 367 U.S. 886, 889, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

The second area outlined by *Roth* as giving rise to a possible claim of deprivation of liberty is much more applicable to this case. Such a claim may be made out where the government, in declining to re-employ an individual, imposes upon him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. *Roth* 92 S.Ct. at 2707. The Court noted:

"The State, for example, did not involve any regulations to bar the respondent from all other public employment in State universities. Had it done so, this, again would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . .' " *Roth* 92 S.Ct. at 2707, quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1949).

In a footnote to this discussion, however, the *Roth* Court gave an example of that which does *not* constitute a deprivation of liberty in this context. The Court stated:

"The District Court made an *assumption* 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.' D.C. 310 F.Supp. 972, at 979. And the Court of Appeals based its affirmance of the summary judgment largely on the premise that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor' amounts to a limitation on future employment opportunities sufficient to invoke procedural due process guaranties. 446 F. 2d [806]. at 809 (7 Cir.) . . . [T]he record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employ-

ment prospects." *Roth* 92 S.Ct. at 2708, fn. 13.

The facts in the instant case obviously fall somewhere between the extremes cited by the Supreme Court. A nontenured faculty member at the University of South Florida can be terminated (i.e., not re-hired) at the discretion of the President. If plaintiff had simply failed to be re-hired without an explanation it would be difficult, under the language quoted above, to find any deprivation of plaintiff's liberty. It must be remembered, however, that in terminating plaintiff, the letter of December 14, 1970, listed reasons such as "lack of performance in the functional program" and failure to substantially contribute to the University outside the limited area of tennis instruction. These reasons, while not constituting an attack upon the integrity of the plaintiff, do create a "stigma" concerning future employment at the university level, and indeed, in the area of education.

Unlike the bare assumptions made by the lower courts in *Roth* there was testimony in the instant case that termination for the reasons given by the University could substantially impair plaintiff's opportunities to obtain employment elsewhere. Dr. Bowers, who initiated the procedures to terminate plaintiff, admitted at trial that, taking into consideration the present job market in the area of higher education, termination for "non-performance" substantially impairs opportunities to seek employment elsewhere in the field. Another witness, Dr. Barber, testified to the same fact. Thus, there is in this case more than a mere "nonretention" of plaintiff, but rather a termination that infringes on plaintiff's liberty to seek employment at other institutions of higher learning.

■ Defendant at trial attempted to demonstrate that the determination of plaintiff's liberty to seek employment elsewhere should not be limited to the area of higher education. Defendant established that plaintiff could seemingly seek employment in the area of private

tennis instruction. Plaintiff, however, has been an educator for thirty years and has been employed in higher education for six years. It cannot now be said that plaintiff must forever satisfy himself with employment in areas outside the academic world, without an opportunity to be heard on the matter. Plaintiff obviously does not have an inalienable right to obtain a job as an educator, but he has a liberty interest in attempting to seek such employment. By terminating plaintiff for reasons of "non-performance", without according him the benefit of an opportunity to be heard at a procedurally sound hearing, the government through the University has deprived plaintiff of liberty without due process of law.

■ In so ruling, the Court does not suggest that plaintiff possessed an interest in continued employment similar to tenure. The University is not hereby required to terminate plaintiff only upon "good cause shown" or some other such burden of proof. Rather, the Court holds that, before plaintiff may be summarily terminated for the "stigma-producing" reasons given, he is entitled to be heard on the matter. The President of the University is free to terminate nontenured faculty members in his discretion. Where, however, reasons are given for the termination which impair plaintiff's liberty to seek further similar employment, notice and an opportunity to be heard are constitutionally necessary. To require a due process hearing on such matters does not obviate the distinction between tenure and nontenure. On the contrary, the University is constitutionally required, where liberty is at stake, to accord some form of due process hearing whereby the nontenured faculty member may attempt to refute or question the specific reasons given for the termination.

### III. FORM OF HEARING

Plaintiff did in fact receive a hearing concerning his termination. Panel III met to consider plaintiff's complaints concerning his dispute with Dr. Bowers

and the administration. Plaintiff was not allowed, however, to have his counsel actively participate before Panel III. Therein does plaintiff claim a violation of his due process rights.

 Defendant initially contends that plaintiff waived any right to have active counsel, and is estopped from claiming a violation of due process as a result. Plaintiff was informed beforehand that Panel III would not allow his counsel to actively participate. But plaintiff registered his objections and made it clear that his counsel would seek to be active in the proceedings. Waiver of a constitutional right is not lightly to be presumed. As stated at the nonjury trial, this Court finds that plaintiff did not waive any right he had to have active counsel at the hearing.

 The due process clause is a necessarily broad concept not reducible to a code of procedural conduct. Even where a party has the right to a due process hearing in a civil matter, that hearing need not always incorporate the full panoply of twentieth century procedural rules. "Civil" due process cannot always be equated with "criminal" due process. In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that due process requires a state to accord an evidentiary hearing before discontinuing payments to a welfare recipient. The Court did not, however, require that the government must provide the full safeguards afforded to a criminal defendant.[5] The Court required such hearings to: 1) be at a meaningful time and in a meaningful manner; 2) provide timely and adequate notice; 3) allow the party to confront and cross-examine witnesses; and 4) allow the party to present arguments and evidence orally.

A further requirement set forth by *Goldberg* is more germane to the facts in this case. The Court stated:

" 'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.' Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). We do not say that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so desires. Counsel can help delineate the issues, . . . conduct cross-examination, and generally safeguard the interests of the recipient. We do not anticipate that this assistance will unduly prolong or otherwise encumber the hearing." Goldberg, 397 U.S. at 271, 90 S.Ct. at 1022.

Defendant's objection to the active participation of counsel is set out in a press release appearing in defendant's Exhibit # 9, p. 56:

"The nature of such a proceeding would appear to necessitate a hearing before a panel having legal expertise rather than a faculty-professional body to determine the issues presented by the lawyers. Experience has confirmed the value of faculty evaluation in matters concerning faculty qualifications, performance and retention. I have made by [sic] decision on the basis of my concern that such a legalistic procedure would tend to destroy the faculty's role which has been of such great benefit in the past."

Defendant Mackey fairly and honestly believes that the active participation of counsel would destroy the usefulness of the faculty advisory role through the Academic Relations Committee.

 The Court concludes, however, that, under the guidelines set forth by *Goldberg, Sindermann,* and *Roth,* the ac-

---

5. For example, the government need not provide counsel for the welfare recipient. It would also appear that the rules of evidence need not be strictly observed in administrative hearings. *See* Davis, Administrative Law Treatise, §§ 14.01 et seq. (1958).

tive participation of counsel at some pretermination hearing is necessary to accord plaintiff due process of law. The *Goldberg* Court noted that counsel, rather than obfuscate the issues and hamper the decision-making process, could serve to "present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient." *Goldberg* 397 U. S. at 271, 90 S.Ct. at 1022. This Court is not persuaded by defendant's concern over active participation of counsel at a due process pretermination hearing.[6] No Court has held that the strict rules of evidence or other procedural codes must be observed. *See* footnote 5, *supra.* An opportunity to be heard is the fundamental right to be accorded.

As stated in the beginning, this Court is *not* a campus administrator. The Court is *not* requiring the hearing panels of the Academic Relations Committee to provide for the active participation of counsel. These panels were created, and may properly serve, as a faculty-administrative intermediary. According to the testimony of the President, Panel III served an advisory function to him and provided faculty participation in certain matters. Plaintiff has nowhere shown that Panel III was in fact the decision-maker regarding his termination. It was "another input of data" regarding the termination. If Panel III had actually been the termination forum, then it of course would have to meet the due process requisites outlined above.

What this Court does hold is that plaintiff, because he was being terminated for stated reasons producing a stigma of incompetency, must be provided with a pretermination hearing allowing the active participation of counsel. The University might well decide to incorporate the existing structure of the Academic Relations Committee for this purpose. Alternatively, if the University wishes to preserve the informal faculty advisory role, it may decide to set up a separate proceeding for the benefit of both the President and the plaintiff. The University must provide plaintiff with due process, but this Court does not specify the administrative route to be taken to effectuate that end.

At trial, counsel for defendant stated: "The due process clause of the fourteenth amendment does not reach the point of requiring that an advisor to a decision-maker must hear counsel before rendering advice—and that essentially is our position."

The Court is in agreement with that position. But regardless of the propriety of the Panel III proceedings, plaintiff must be accorded due process at *some* pretermination hearing.

In summary, the Court holds that plaintiff was deprived of liberty without due process of law. His liberty was reduced by his notification of termination for reasons of "lack of performance," etc., which produced a stigma substantially hampering plaintiff's ability to seek further employment in education. Due process was lacking in the proceedings provided by Panel III, in that plaintiff's counsel was not allowed to actively participate therein. Thus, any proceedings conducted by Panel III which do not allow for active counsel cannot serve as the required hearing. Before plaintiff can be terminated for the reasons given, he must be accorded in some pretermination hearing the requisites of fundamental due process outlined by *Goldberg*.

### IV. THE "UP OR OUT" RULE

Defendant contends that plaintiff will be terminated June 14, 1973, by reason of the "up or out" rule which provides:

"2. The President shall terminate the employment of any eligible faculty member who has not been granted tenure at the close of the sixth year of continuous employment by giving notice of the additional terminal employ-

6. The Court notes that Dr. Reilly, the chairman of Panel III, was himself a member of the bar and practiced law for a short time.

ment provided for above. . . ." Staff Handbook, University of South Florida, 1970–71, p. 28.

At trial there was some question as to the precise operation of this rule, and the notice necessary to effectuate it, but the postponement of plaintiff's termination until June of 1973 obviates the necessity of deciding these questions.

Defendant contends, however, that the "up or out" termination of plaintiff is independent of the events before this Court. Defendant asserts that, since plaintiff did not receive tenure within the six year period, he can be terminated without due process because this termination is automatic and unconnected with the prior troubles between the parties, and that the question of an "up or out" termination is independent of the events before the Court.

Plaintiff counters that if he had been accorded a due process hearing before Panel III, he might have been able to demonstrate the falsity of the reasons given for the termination. Consequently, he might have been able, but for the deprivation of due process by the University, to obtain tenure and avoid the "up or out" rule.

The Court has concluded that the operation of the "up or out" rule does not serve to moot the issues before this Court, and that plaintiff is still entitled to a due process hearing before termination. In so holding, the Court does not follow the sequence of highly improbable "ifs" constructed by plaintiff. The Court need not assume that plaintiff would have received tenure had his counsel been allowed to actively participate. The University has, however, indicated quite clearly its desire to terminate plaintiff for the reasons given in the letter of December 14, 1970. It cannot now contend that plaintiff's termination should be allowed without a due process hearing for his failure to achieve tenure within six years. The stigma produced by the charges of "lack of performance," etc., is not thereby dissolved. Plaintiff's liberty is not thereby

restored to him. Consequently, if the University seeks to terminate plaintiff under the "up or out" rule by June 14, 1973, it should proceed quickly to accord plaintiff a hearing prior to that time. At this point, to terminate plaintiff without first providing a due process hearing would violate the injunctive orders of this Court.

Upon consideration of the evidence produced before this Court, including testimony, exhibits, and depositions, and the legal contentions of the parties, the foregoing memorandum opinion shall constitute the findings of fact and conclusions, of law of this Court, in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure. Whereupon, it is

Ordered:

1. The defendant Cecil Mackey, in his capacity as President of the University of South Florida, is hereby permanently enjoined from terminating the employment of plaintiff Phillip G. Ortwein without first according to plaintiff Phillip G. Ortwein a hearing which comports with the minimum standards of due process of law described herein.

2. This opinion and order shall constitute final judgment in this cause. Each party shall bear its own costs.