**Mary B. SIGMON, Plaintiff,**

v.

**William E. POE, Individually and as Chairman, Charlotte - Mecklenburg Board of Education, et al., Defendants.**

**No. C-C-74-158.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Sept. 5, 1974.

William K. Diehl, Jr., James, Williams, McElroy & Diehl, P. A., Charlotte, N. C., for plaintiff.

Harry C. Hewson, Jones, Hewson & Woolard, Charlotte, N. C., for defendants.

McMILLAN, District Judge.

### FINDINGS OF FACT

Mary Belle Sigmon, plaintiff, brought this suit against the Charlotte-Mecklenburg school officials and the Board of Education, seeking reinstatement in her job as a fifth grade school teacher, and also seeking damages and other equitable relief. Jurisdiction is alleged under 28 U.S.C. §§ 1331 and 1343, and under 42 U.S.C. §§ 1981, 1983 and 1985. Declaratory relief is also sought under 28 U.S.C. §§ 2201 and 2202.

Plaintiff is forty-three years old and has taught in the public schools of North Carolina for nine years, the last four years being spent at the Plaza Road Elementary School in Charlotte.

Plaintiff's contract was not renewed when it came up for consideration in April of 1974. A hearing was conducted in this court on August 26, 1974, to determine whether to grant a temporary restraining order and other preliminary equitable relief.

The question is whether the plaintiff was entitled to notice of defendants' intention not to renew, and to a hearing before the Board of Education or some

appropriate tribunal before the defendants decided not to renew her contract.

Under North Carolina General Statutes § 115–142, public school teachers are classified as career teachers or probationary teachers. A career teacher is one who has served more than four years in a particular school system or who has served four years and has been re-employed for the fifth year. A probationary teacher is one who has served less than five years and has not been re-employed for a fifth year.

Section 115–142(e) sets out specific limited grounds for dismissal of a career teacher, and a procedure calling for notice and hearing and substantial due process rights in the case of dismissal of career teachers.

Section 115–142(m) deals with discharges of probationary teachers, and non-renewals of their teaching contracts. It reads as follows:

"(m) Probationary Teacher.—

(1) The board of any public school system may not discharge a probationary teacher during the school year except for the reasons for and by the procedures by which a career teacher may be dismissed as set forth in subsections (e) and (h) 2 (*l*) above.

(2) The board, upon recommendation of the superintendent, may refuse to renew the contract of any probationary teacher or to reemploy any teacher who is not under contract for any cause it deems sufficient; *provided, however, that the cause may not be arbitrary, capricious, discriminatory or for personal or political reasons.*" (Emphasis added.)

The statute makes no provision whatsoever for notice or hearing on the non-renewal of contracts of probationary teachers.

In April of 1973, pursuant to regular routine, Mrs. Sigmon was given a personnel evaluation by her principal, Mr. Melvin Jaynes. The copy of the evaluation that she received showed her performance to be "Satisfactory" in all of the thirty areas of scrutiny except "Classroom Techniques," in which area her preformance was listed as "Marginal" (on a scale of "Satisfactory," "Marginal," or "Unsatisfactory"). Unknown to Mrs. Sigmon, the carbon copies of this report which went into her personnel file (though not the copy given to her) can be read to show her performance as "Marginal" in two other particulars, one being classroom control and the other being ability to arouse student interest.

In August of 1973 Mr. Jaynes informed Elisabeth Randolph of the Superintendent's staff that he was unhappy with Mrs. Sigmon's work, but was hesitant to recommend that her contract *not* be renewed for 1974–75, because her husband was a fellow principal. Eight months passed, however, before she heard that Mr. Jaynes was seriously considering an adverse recommendation.

In September, 1973, Mr. Jaynes and Mrs. Sigmon had some conversation about various matters of criticism including some student complaints about her "traditional" efforts to administer corporal punishment (legal under North Carolina General Statutes § 115–146), and her teaching methods, which contemplated a lot of copy work. Mr. Jaynes' criticisms were never given to Mrs. Sigmon in writing until March 21, 1974, when Mrs. Sigmon received them in letter form bearing the date of October 2, 1973.

However, on October 18, 1973 (see Jaynes' affidavit), a general directive was issued by Assistant Superintendent Bill Anderson, calling upon principals to make a report to the Personnel Department on what they considered to be "the most serious employment problems in your school . . ." The directive instructed principals, pursuant to General Statutes § 115–142(b), to "be sure that each employee in your school . . . is aware that he or she may make a written response to complaints, commendations and suggestions . . ." On October 22, 1973, Mr. Jaynes responded with a written form report describing

Mrs. Sigmon's service as unsatisfactory in several areas. Mrs. Sigmon was not told of this correspondence; it was kept out of her personnel file; and she did not hear of it until after her fate had already been decided in April, 1974.

On March 1, 1974, Mr. Anderson, the Assistant Superintendent for Personnel, directed Mr. Jaynes and other principals to submit by March 19, 1974,

" 'Evaluation of Teaching Competency' forms for all probationary and all career teachers whose dismissal you are recommending."

Mrs. Sigmon, whose husband is principal of Winterfield Elementary School, was aware of this March 19, 1974 deadline.

Mr. Jaynes did not submit such an evaluation by the March 19, 1974, deadline, nor did he hold the evaluation conference with Mrs. Sigmon. Instead, he wrote Mrs. Sigmon on March 18, 1974, a letter, styled as "constructive criticism," listing a number of old and new criticisms of her work. In the same envelope he forwarded, in the form of a letter dated October 2, 1973, his comments on the conference he had had with plaintiff the previous September. On April 5, 1974, Jaynes wrote Mrs. Sigmon and told her that he was sending the October 2, 1973 letter and his March 18, 1974 letter to the school office for inclusion in Mrs. Sigmon's personnel file. Although Mrs. Sigmon might reasonably by that time have inferred that he was "making a case" against her, Jaynes still had not mentioned to her his then completely formed intention to recommend that she not be re-employed.

By letter of April 22, 1974, Jaynes first notified Mrs. Sigmon that he would not submit her name for contract renewal. This was the first notice she had had that her contract would not be renewed.

On April 24, 1974, Jaynes presented Mrs. Sigmon with a form report containing his unsatisfactory evaluation of her work (the evaluation that was due on March 19), and asked her to sign it. She refused, because the required eval-

uation conference had not been held, and the unsigned evaluation was delivered to the Superintendent's office on April 24th.

On April 24, 1974, Mrs. Sigmon wrote, registered mail, return receipt requested, to Mr. Anderson, the Assistant Superintendent for Personnel, at his address in the Education Center, requesting a hearing under established administrative grievance procedures. Although the letter was properly addressed, it was returned "Unclaimed" after three notices. Mrs. Sigmon did not get it back in the mails until May 8, 1974.

Mr. Jones, the Superintendent, met with the Personnel and Grievance Committee on April 19th, and later. Pursuant to Jaynes' recommendation, Mr. Jones recommended that the contract not be renewed, and the committee recommended to the Board that it not be renewed.

On April 30, 1974, the Board of Education met secretly, in "Executive Session," heard testimony from Jaynes only, and voted not to renew Mrs. Sigmon's contract. Mrs. Sigmon was notified April 30th by mail.

On May 7, 1974, Mrs. Sigmon wrote a three-page letter to Mr. Jaynes in reply to the charges that she had heard of, and called for a hearing under the grievance procedures. Jaynes replied on May 10, 1974.

On May 7, 1974, Mr. Anderson wrote Mrs. Sigmon acknowledging that the Board at last had a copy of Mrs. Sigmon's request for a hearing, but taking the view that the "grievance procedures" of Board Directive No. 4160 did not apply to her case. (On this point the court agrees, because the grievance procedures are confined in their terms to "issues which may arise from time to time with respect to the working conditions of professional employees.")

After Mrs. Sigmon learned what had happened, and wrote her letters of April 24th and May 7th (and after Mrs. Sigmon's husband, principal at another school in the county, had busied himself

considerably in the matter), the Superintendent apparently realized the unfairness of discharging a teacher without notice or hearing. He said that he was caught between two fires and had to decide whether to stick by the principal, which was the usual custom, or to try to follow a fair procedure; and he recommended that a hearing be conducted.

On May 17, 1974, Mr. William K. Diehl, attorney for Mrs. Sigmon, wrote defendant Jones requesting a hearing for Mrs. Sigmon either before the full Board or under the established grievance procedures.

On May 20th, Mr. Anderson replied that the Board would hold a hearing on May 28, 1974, to afford Mrs. Sigmon "the opportunity to present evidence that the Board's refusal to renew your contract was arbitrary, capricious, discriminatory or for personal or political reasons."

On May 22, 1974, Mr. Diehl wrote the Superintendent about the forthcoming hearing, making certain requests for information, including the reasons for nonrenewal, and saying that

".  .  . It is somewhat difficult to now envision the Board which has already decided the case as being the impartial tribunal to decide whether the Board was wrong."

That did it. Pursuant to a telephone conversation with the Board chairman, the Board attorney called the Superintendent, and the scheduled hearing was cancelled by letter of May 27, 1974. On May 28, 1974, a Board attorney wrote that "the cancellation of the hearing tonight was permanent."

On May 31, 1974, after another telephone conversation with the Board chairman but without a meeting or a vote of the Board (and without even the knowledge of the four Board members whose views appear of record), a complaint was filed in Mecklenburg County, North Carolina Superior Court, signed only by a lawyer for the Board, entitled "The Charlotte-Mecklenburg Board of Education, Plaintiff, vs. Mary Belle Sigmon, Defendant," seeking a declaratory judgment that plaintiff is entitled to no hearing short of Superior Court and that the hearing in Superior Court is limited to the question whether the failure to renew the contract was "arbitrary, capricious, discriminatory or for personal or political reasons." (Subsequent to the August 26th hearing in this case, a majority of defendant Board, at a meeting on August 27, 1974, "ratified" the previous action of the Board's attorney in filing the May 31, 1974, suit.) No hearing has been had on any of the matters involved in the Superior Court suit, so far as the evidence reveals. (There is considerable doubt that the Superior Court suit, not authorized by Board action, is a prior valid and subsisting action; see McLaughlin v. Beasley, 250 N.C. 221, 108 S.E.2d 226 (1959); Edwards v. Board of Education of Yancey County, 235 N.C. 345, 70 S.E.2d 170 (1952); Iradell County Board of Education v. Dickson, 235 N.C. 359, 70 S.E.2d 14 (1952). However, for present purposes it is not necessary to determine that question.)

On July 25, 1974, plaintiff filed the present action.

## CONCLUSIONS OF LAW

The Fourteenth Amendment to the United States Constitution, Section I, says in pertinent part,

".  .  . nor shall any State deprive any person of life, liberty, or property, without due process of law  .  .  ."

Plaintiff contends that her liberty has been infringed and that liberty may be infringed only pursuant to due process of law. I do not rule out the very live possibility that it is a genuine deprivation of liberty to discharge a professional teacher of substantial longevity without any notice or opportunity to be heard. Such a discharge at a time of year crucial to educational employment no doubt does create a stigma in the eyes of the public and a difficulty in procuring other employment. I do not dismiss liberty as being one of the channels by which

plaintiff's entitlement to due process arises.

It is on the property loss, however, that plaintiff's strongest right to due process on this record arises.

■ The defendant Board of Education had a practice and the Superintendent issued a directive requiring principals in the fall of the year to report teachers whom they intended to rate as unsatisfactory, and to "be sure that each employee in your school . . . is aware that he or she may make a written response to complaints, commendations and suggestions." This was not done. Mr. Jaynes' adverse report of October, 1973, in furtherance of his decision not to renew plaintiff's contract, was a secret report never communicated to the plaintiff until late the following spring. The plaintiff had an interest under established procedures in knowing of this adverse action, and the secret report by the principal was a violation of her right to have that knowledge. This is a violation of a property right which entitles her to a due process hearing.

There is another and still stronger property right involved.

■ Not until 1971 did probationary school teachers have any statutory rights to employment. The 1971 statute, General Statutes § 115–142(m), established a right on the part of a probationary teacher not to have his re-employment denied for "arbitrary, capricious, discriminatory or for personal or political reasons." Section 115–142(m)(2) sets a standard for the non-renewal of teaching contracts of probationary teachers. It creates a right to have the grounds for termination measured by that standard.

It is believed that these legal conclusions are supported by the following decisions: Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Johnson v. Fraley, 470 F.2d 179 (4th Cir. 1972); Whitney v. Board of Regents, 355 F.Supp. 321 (E.D.Wis. 1973); Kennedy v. Sanchez, 349 F.Supp. 863 (3–J.Ct., N.D.Ill.1972); Stout v. Whiteaker, 379 F.Supp. 218 (M.D. Tenn.); Francis v. Ota, 356 F.Supp. 1029 (D.C.Haw.1973); Ortwein v. Mackey, 358 F.Supp. 705 (M.D.Fla. 1973); Thomas v. Ward, 374 F.Supp. 206 (M.D.N.C.1973); Aster v. Board of Education, 72 Misc.2d 953, 339 N.Y.S. 2d 903 (Sup.Ct.1972).

Neither the legislature nor the defendants have provided a machinery whereby the Board's application of the statutory standard can be measured. The right of appeal in Section 115–142(n) expressly relates only to terminations under subsections (k) and (l) and does not apply to terminations upon the grounds listed in subsection (m).

The action of some of the defendants in scheduling the May 28, 1974, hearing is a recognition that plaintiff was entitled to a hearing as a matter of constitutional right. The action of some of the defendants in cancelling the hearing because of some hard-nosed language from plaintiff's counsel is a denial of that right.

■ Whether Mrs. Sigmon keeps her job as a long run proposition is a decision for the defendants to make. They must make it, however, by methods that pass the fairness tests of the Fourteenth Amendment to the United States Constitution—full notice of the alleged grounds for removal or non-renewal, and opportunity to be heard on the question whether the alleged cause for removal is "arbitrary, capricious, discriminatory or for personal or political reasons."

Fair procedure is thus required by law.

Fair procedure will set a better example for the watching children than the one-sidedness and secrecy which present methods entail. It will also promote fairer results, because it will require those who judge to hear both sides before they decide.

■ This court has jurisdiction; this order does not restrain any pending state suit nor call for a determination of the

unconstitutionality of any state statute; and the remedy at law is inadequate if plaintiff is not reinstated pending a full and fair hearing. The plaintiff's possible remedy at law is inadequate because if Edelman v. Jordan, 414 U.S. 1301, 94 S.Ct. 13, 38 L.Ed.2d 15 (1973) applies (and it may apply), there is not way that she can obtain damages from the Board of Education, a state agency, for back pay. The harm to her, if her discharge interferes with her getting a job, is great and irreparable. The plaintiff has demonstrated a probability of prevailing on the merits. The case is a proper one for equitable relief.

For the reasons above outlined, temporary equitable relief should be granted and the defendants should be directed to reinstate plaintiff as a teacher immediately, and to provide a due process hearing on the matters in controversy.

### ORDER

It is therefore ordered, pending further orders of court, that plaintiff be reinstated immediately, with salary and other compensation, computed as though she had been re-employed for 1974–75, as a teacher in the Charlotte-Mecklenburg schools; and that defendants are enjoined and restrained from removing plaintiff from her job as teacher for any presently existing cause until and unless they conduct or cause to be conducted a full hearing on the question whether the Board's refusal to renew Mrs. Sigmon's contract was "arbitrary, capricious, discriminatory or for personal or political reasons," with ample notice and adequate opportunity to the plaintiff to appear and protect her interests, with counsel, and to challenge and cross-examine opposing witnesses and to present evidence of her own. Although I find herein that the actions of the defendant Board of Education were constitutionally unfair because of the *procedure* followed, I do not share the suggestion of plaintiff's counsel that the members of the Board are personally incapable of conducting a fair hearing and rendering a fair decision. Counsel for both parties

are directed to confer and to agree, if possible, upon procedures and a tribunal for the conduct of such a hearing, if either party desires such a hearing. If there is any disagreement about the procedures or the tribunal, counsel are requested to advise the court by October 1, 1974. If the result of the hearing is adverse to the plaintiff, defendants are directed to file a certificate of the result with the Clerk of this court within five days of the decision, and the plaintiff is directed to show cause in writing, within ten days after the filing of such certificate, why the restraining order should not be dissolved.

The resumption of employment required by this order is not to be treated as the ordinary renewal of a contract for the fifth year, and will not constitute the plaintiff a "career teacher" unless the Board decides to re-employ her.